and Seeley v. Bruister, Consolidated Cases, and Mr. Johanson, we'll hear from you first. Good morning, Your Honors. I appreciate the opportunity to be before you today and present our position, our client's position. Mr. Bruister, Mr. Herbert C. Bruister, and Bruister Family Limited Liability. I beg your pardon? Mr. Bruister, Herbert C. Bruister, and Bruister Family Limited Liability Company are my clients today for purposes of this argument. Your Honors, the core of this case, in our opinion, in my client's opinion, is about the court valuations that are not evidence in this case. There's a standard under ERISA, Section 408E of ERISA, that says if the transactions occur at no more than fair market value, they satisfy an exemption under ERISA and they're not prohibited transactions. The court valuations were created by the Honorable Judge Jordan. Judge Jordan took Mr. Range's valuation. Mr. Range was my client's expert. He testified at trial. He was deemed to be at least as reliable as the other expert witnesses. What is the distinction between your evaluations and the plaintiff's evaluations that you call to our attention that make a difference and is a serious error on the part of the district court? I'll raise a couple right away, Your Honor. A serious error on the $3.8 million. The way an ESOP transaction works is that you can put the money into the ESOP and the money can come back out to the corporation. But then if there's a mirror loan going out to Brewster Family Limited Liability Company, if you don't pay that money out to Brewster Family Limited Liability Company, it's not deemed to be a payment on the loan. That was one error. And the other error that Judge Jordan made in that respect, and this is at page 47 of our brief, this is a clear error. Judge Jordan concluded that there was not a release of shares from Brewster and Associates Company, the company itself, to the ESOP. Well, the stock was in the ESOP. It wasn't to be released from the corporation to the ESOP. It was already in the ESOP. So that's why the $3.8 million was an error and it wasn't supported by the testimony of Ms. Smith and Ms. Henry at trial. I mean, just synthesize it. Yes. Get the point here, what you're trying to say. The point is that plaintiffs continued to argue that $3.8 million went into the ESOP, came back out to the corporation, and went to Mr. Brewster or Brewster Family Limited. But it did not. And it did not. Where did it go? It stayed in the corporation. It created a tax deduction. It created value, Your Honor. It didn't create a loss for the ESOP. And that's our argument. So that's a clear error. That's one. Well, that goes to the methodology of the district court's determination, though. That also was the methodology that was used by the plaintiff's experts, Your Honor. That was the facts that the plaintiffs provided to their experts. And their experts— Well, what's the bottom line impact on the damages of that alleged error? Well, if you've got a $3.8 million payment, there was to have occurred. Judge Jordan considered that $3.8 million payment in deciding how much damage had been incurred for the ESOP and the transactions. Right. But that wasn't a total component. It would have been part of a netting out, right? It was part of it. It was part of the error. And it's a clear error. How much difference, if that were to be accounted for in Judge Jordan's bottom line, how much would that account for? I think that's got to go back to Judge Jordan because Judge Jordan created the court valuations that weren't evidence, and we didn't even have a chance to argue that the court valuations were incorrect. Well, you could have filed a motion for a new trial or a motion for Rule 59 or something, right? We did not. I'm sorry, Your Honor. We did not. Okay. But isn't it standard practice when there are issues of valuation for— I mean, at least this was true when I practiced bankruptcy long ago, that judges would hear testimony from experts for both sides, and quite often the judge would come up with something in the middle. And you call it the court valuation, but it's also shielded by clear error normally. Your Honor, if you look at the case law, the appellate case law in Florida, which is straight on this issue, you can't split the difference. That's not evidence. A court valuation is not evidence. Gosch v. Lehman, 962 Southern 2nd, 398, 2007. What do you mean it's not evidence? It's not evidence. What does that mean, it's not evidence? It's a method of calculating it. Does it mean it's incorrect? It's incorrect, and it cannot be deemed to be evidence, Your Honor. Well, let me ask you a question, though. He said at the end of his discussion of the valuations that he was reassured about his split-the-difference sort of model, which did give Mr. Range 50%, by the way. He was reassured because he came out close to where the Bear people had come out in Donnelly with their $30 million calculation. Your Honor, he created his own valuation. But is that not a correct statement, that he ended up essentially where the Bear people did? I don't know if he ended up exactly where the Bear people did. I think the Bear people helped Donnelly create a valuation that was in December 2005, $39 million, not $30 million. Well, right, but the Bear people, according to the emails that the district judge laboriously went through, the first Bear calculation given to Donnelly was about $30 million, and that's when Donnelly sent it to you, and you were tweaking it and trying to get it higher. And, Your Honor, I did not tweak it, and I did not improperly influence the value. Well, the judge was entitled to make a credibility call, wasn't he? And, Your Honor, I'm telling you right now, I did not tweak any valuations. I gave factual information, and I'll tell you right now what that factual information was. I gave factual information about the Anderton offer. Donnelly ignored it. I didn't influence him if he ignored that factual information. I gave factual information about Hurricane Katrina, which was the single worst natural disaster. I wasn't here. I'm glad I wasn't here. But, Your Honor, I gave factual information to Mr. Donnelly and others about Hurricane Katrina that it happened. I gave factual information about the substantial number of vehicles that Brewster had bought that year. I gave factual information about the union election battles. Your Honor, we're getting into second guessing if we start to focus on those things. Well, that's sort of what the judge did in his whole liability finding, but you're focusing on valuations, so I was asking you about comparisons and valuations. By the way, can I ask a quick question? It says I've only got eight minutes left, but I thought I had 25 altogether, so we started only with 15. I have 20. Okay. Thank you, Your Honor. If we have more questions, you can answer them. Okay. Thank you, Your Honor. I appreciate it. May I continue? Sure. Thank you. Pointing out other issues that I think are wrong, as you said, Judge Jolly, as you asked me the question, what are wrong with the Messina and the Mercer valuations? Messina failed to consider BAI, Brewster & Associates, Inc.'s actual expenses. He created his own hypothetical expenses and applied them to create a valuation. Mr. Range testified at Record on Appeal 29942 that that was not a proper valuation. Did the court say anything about these errors that you were talking about? Did it explain it, or did it just ignore the points that you're making now? In my opinion, it ignored those points and didn't take them into consideration. I don't believe he did properly address those points. You don't believe he properly addressed it, but that's my point. I mean, he took it into consideration, and it's very difficult for us, I mean, to say that he abused his discretion. I mean, he had a lot of evidence before him and a lot of facts before him and a lot of facts that he didn't think were facts. This was a clear error, Your Honor. You can't pull things out of thin air and put them into a valuation. I mean, everybody knows that. I guess the bottom line here is that Messina and Mercer came up with somewhat comparable bottom line evaluations, leading the judge to say, I'm going to count them on one side of the equation and Mr. Range on the other side. Your Honor, Judge Jones, do you want a standard in the Fifth Circuit in this country that takes a valuation from a legitimate guy like Mr. Range, who has been well-respected throughout the country, and then you want to have the plaintiffs just pick a low-ball valuation and throw it against that? I hate to tell you, but a lot of law is unfair, but one of the reasons that judges are allowed to make credibility calls on experts and then are shielded by clear error is that we are not experts on valuation, and to ask the judge to pick Mr. Range or Mr. Messina would be asking the judge to have a higher level of particularity than the fiduciaries had. Your Honor, let's look—Judge Jones, let's look— And there's no law that supports what you're saying. That's my bottom line, sir. Your Honor, let's look at this Fifth Circuit's opinion in Donovan v. Cunningham. This judge was not to create—Judge Jordan was not to create a de novo valuation. My opinion and Mr. Brewster's opinion and my client's opinion is that he created a de novo valuation here. He—rather than look at what Ms. Henry and Ms. Smith did in good faith, and they testified in good faith that they did it in good faith, rather than look at that and Range corroborated— It's the court to determine who's testifying in good faith. He's got another point. My point is that if you look at—Your Honor, if you look at 1468 on the Donovan v. Cunningham case in this circuit, this court said that it was not Judge Jordan's job to create a de novo valuation. That is exactly what happened when you created a court valuation. You created a de novo valuation, and that's what we argue. But he was doing that for purposes of damages, not for purposes of determining the breaches of fiduciary duty. Well, we can talk about breaches of fiduciary duty, too, and I'll take a couple minutes to do that before my primary argument is done, Your Honor. I'd like to finish on a couple other valuation points. Mr. Messina and Mr. Mercer both used incorrect debt amounts. It's clear in the record, pages 56 through 60 of our opening brief, Defense Exhibit 184, Appellate Exhibit 193, it's very clear in the record that Mr. Range used the correct debt amounts. Mr. Messina and Mr. Mercer did not. And the way valuations work, Your Honor, if I may for one second, the way valuations work is that you create an enterprise value, you subtract the debt, and you get the net, and that's the equity value. How can it be correct if they used the incorrect debt amounts? I certainly would agree with you. Mr. Seeley's brief has a footnote which purports to explain the origin of those debt values, other than from Donnelly. Your Honor, I obviously was lead trial counsel. I sat there, and Henry and Mrs. Smith, they provided the testimony that corroborated, from the Brewster financial statements, the debt amounts. The Secretary never provided the correct data to Mr. Messina at record on Appeal 28458 and 28460. So Messina never got it. And Mercer didn't use the correct amounts in some instances. Well, do you have any? Oh, here you go. Here's what Mr. Seeley says about it, because I agree this is a very important point. Mercer used the debt figures BAI reported at the time of the transactions. Mr. Messina adjusted the debt figures on BAI's contemporaneous financial statements. And then he says Mr. Range took a different as the court determined none of those approaches was clearly correct or incorrect. Your Honor, I think that's a clear error, because I think if you look at the testimony and you look at the brief from 56 through 60 and the exhibits that I mentioned and the testimony that I mentioned, it is clear that Ms. Smith, who was the controller for Brewster and Associates, testified about all the actual debt amounts. And then I took the experts through the actual debt amounts, and both of them concluded that they didn't use the actual debt amounts from the financial statements. You got that on cross-examination? I did, Your Honor. And if I may, a couple more points, because I obviously want to be respectful of my 25 minutes here and get through all my points. Inaccurate projections. Judge Jordan was concerned about inaccurate projections. Judge Jordan, to respond to that, BAI's revenues were consistent with the DIRECTV reports, record on appeal 282-94. Also, the valuations. There's no misunderstanding about it. You have a total of 20 minutes. You have 15 minutes for your primary argument. Then you have 5 minutes for rebuttal. I put on the sheet, Your Honor, 25 and 5 is what I put. You're wrong. It's 20. Well, as a matter, I mean, I have a lot of questions. As long as we are interested in what you're saying, you're going to get a full day here. But we'll decide when the full day is ended. Thank you, Your Honor. The second point, Mr. Donnelly's valuations used BAI's expenses consistent with the BAI financial statements. There was a red herring about GAAP. GAAP was brought. There's no requirement under ERISA that you use GAAP-based financial statements. But doesn't that make it harder to evaluate? Excuse me? I was just surprised that a company with nearly $100 million in revenues and 1,300 employees and probably going to the bank for working capital loans occasionally or whatever didn't do its accounting through GAAP. Your Honor, there's many, many companies in this country that are well run that don't have GAAP-based financial statements. And Brewster & Associates was one of them. And Mr. Range testified that he thought the financial statements were of a very high quality. Your Honor, I think there was a lot of second-guessing, as I said, about Hurricane Katrina. The trustees looked at Hurricane Katrina, and they said that may create additional revenue opportunities. All right. You're out of time now. Tell us what points you want to make that you're not going to repeat yourself on. That's the 15 minutes, Your Honor. Well, I have a question. Sure. May I ask a question? Of course you may. Thank you. Did you contest the amount of propriety of the judgment interest in the trial court? Yes, we did. Did Judge Sheridan's opinion say that you didn't? It seemed to me maybe he – well, they'll tell me. The other side will tell me. I thought we had, Your Honor, and I thought we had indicated that – We certainly briefed it on appeal. Yes, we did. Right. And is there any obvious reason, in your view, why 8% is wrong? No, there's not an obvious reason at that time when interest rates were comparable to that 7.5% that was used. From 2010 on, or are you talking about 2005? No, this is – we're talking about 2004 and 2005 were when these transactions happened, so that's the interest rates to look at. But the prejudgment interest runs from 2010 forward. I think the issue with the prejudgment interest, the only argument we made on appeal, Your Honor, was that it was applied to Mr. Brewster and BFLLC and not applied to Ms. Smith and Ms. Henry. Okay. Go ahead, Your Honor. And also, are you deciding not to stand on your argument about the loans not being paid off? Your Honor, the point I would make on the loans not being paid off are two points. First of all, was there any lost compensation? And I'm looking at the Zell case and the Tribune case. Was there any lost compensation? The participants were still paid their same level of compensation. They were still paid their same benefits. And on top of that, they had the CSOP benefits. So nothing was taken away from them in order to provide the CSOP benefit. Your Honor, also I'd query whether even if Mr. Brewster and the trustees had done the transactions at the court valuations, there's still a windfall issue here because what would have happened? So if they'd done them at that valuation, there would have been any benefit to the ESOP at the end of the day because three or four years after the transaction happened, events occurred like Siebel Systems, like the Bell South loss of that contract. Other things happened that caused the business to go out of business. But, see, I didn't see anything about what caused the business to go out of business. So there was – It didn't have to do – did it have to do with what Judge Sheridan identified as the three big problems, Katrina, or the vehicle game changer, or whatever the third one was? There was just speculation about that. There was no evidence that was presented that proved that something – one of those things caused it. I added two other things that I know happened after 2005 that should be considered, Siebel Systems, the loss of the Bell South contract, both brought up at trial, that were not reasonably understood to have occurred by the trustees at the time that they made the decision to do the transactions. May I go for one more issue, Your Honor? You can state what it is. Okay. I was just going to point out, if I could, the one more – bear with me. The issue of whether or not Mr. Brewster supplanted the authority of Mrs. Smith and Mrs. Henry. Mr. Brewster, the case on this is Schlegel v. Boswell. We have that. And there's a key phrase in there I'd just like to read for one minute, if I may. The key phrase is, To satisfy the authority or control element, the plaintiffs must demonstrate, and I'll say that Mr. Brewster caused the trustees to relinquish independent discretion in investing the plans fund and follow the course prescribed by Mr. Brewster.  Thank you for letting me be heard, Your Honors. I really appreciate it. Okay. Thank you, Mr. Johnson. You've saved some time for rebuttal. Mr. Copeland, Mr. Sealy, we'll hear from you. Excuse me. Let me get my – Good afternoon, Your Honors. My name is David Copley, and it's an honor to be here. It's my first appearance in this court, so thank you very much for giving me time today. The facts of this case are clear, as stated in Judge Sheridan's 84-page opinion. By 2001, Herbert Brewster saw his company going downhill, diminishing profitability and lower margins. He wanted out. And his way out was provided by his attorney, Mr. Johanson, who described a way to transfer ownership of the company to an ESOP, remove any risk for Mr. Brewster himself. And that's what happened. Just for the sake of argument, Judge Sheridan doesn't say anything about Mr. Brewster foreseeing the downfall of his company as early as 2001. There's certainly plenty of stuff in Judge Sheridan's opinion about 2005, but nothing about 2001 that I recall in his findings. I don't recall if Judge Sheridan made a specific finding about this, Your Honor. But there is evidence in the record that the reason Mr. Brewster started looking for a buyer for the company back in 2001 was the fact that margins were going down, profits were going down, and – How old was he at that time? I am not aware, Your Honor. Maybe he was looking at retirement. That is a possibility. He did try to sell the company to other parties before he turned to the ESOP method, did he not? Yes, he did. And he had no success in trying to sell his company? Absolutely, Your Honor. Was the company totally dependent upon DirecTV's contracts? Yes, it was, Your Honor. So DirecTV could quit doing business at any time it wanted to pursuant to the contracts, under the contracts, and that would be the end of the company? That is accurate, Your Honor. The company may have been able to retool, but – What are his motives? How are they relevant to whether there's a liability finding here, breach of duty, whatever, and the damage question? I mean, let's assume that you're right. Either he did something that violated his breach of fiduciary duties, and there was damages, legal damages, right? So rather than painting a jury argument of how you don't like this guy and what his motives are, why don't we deal with seemingly the important thing in this question, is the calculation of damages and whether they're justified or not. I agree with you, Your Honor. The motives themselves are not important. They just give background for the transaction, and what we observe in the transaction is a situation where the owner of a company creates an ESOP to acquire the company, basically a captive audience. He hires an appraiser without investigating the qualifications of the appraiser. He doesn't give the necessary information to the appraiser, and then he influences the appraiser and the other fiduciaries of the trust to make sure that he sells the company at the highest possible price. I guess what concerns me, I mean, you know, the findings are shielded by clear error as to the existence of a fiduciary breach, and that's that. But there are a lot of ESOPs that operate this way, are there not? Do you make a practice of suing ESOPs? We sue ESOPs when there is not adequate consideration paid. That's sort of your specialty? Our firm does a lot of ERISA work, Your Honor. Okay. I was just wondering, and then at some point I have some questions about . . . I think Judge Durden took a little too lightly the question of Mr. Seeley's ability to sue here. I'm sort of wondering what value was added to this case by your . . . I mean, I realize you filed suit, and maybe the Labor Department did afterwards, or did you file suit while they were investigating? The point is, once the Department of Labor has gotten in with the same material allegations, same requests, and so on, what value is added by your clients separately suing? Well, Your Honor, we did file an independent action, as we're allowed to do, under ERISA. And then once the litigation was instituted, we worked hand-in-hand with the Department of Labor. They had their investigators. They had their attorneys, obviously. And we worked in conjunction with them to economically pursue the litigation. Whether Mr. Seeley had any particular genius that contributed to the value of the case is unclear, but that's not really the question. The point is, we are trying to recover funds on behalf of the ESOP. Well, so is the Labor Department. Yes. Yes, Your Honor. So you're going to get several million dollars in attorney's fees for doing what the government is doing for everybody for free. Well, and Your Honor, that's . . . I don't want to be too crude about it, but that's the bottom line. And the bottom line is that Mr. Seeley and his counsel worked very hard to recover funds on behalf of the plan. So what was your particular . . . well, okay. All right. The only question I have legally is, and I think it's pretty significant, yes, you have an argument that any plan participant may sue on behalf of the plan, but what guarantee is there that a person in Mr. Seeley's position could not simply sue as a stalking horse for a company, the same as you say that a class action representative who isn't fulfilling his fiduciary duty to the class can settle out, bind everybody under res judicata, and insulate the company from liability? Well, Your Honor . . . Isn't there an agency problem inherent in what you're doing? In some cases, Your Honor, there is a question about agency, but that's not this case. In this case, we did sue on behalf of the plan as a whole, and the Department of Labor sued on behalf of the plan as a whole, and as Judge Jordan noted, the role of the Department of Labor in this case completely addresses any concerns about disbursement or representative capacity. And furthermore, after the judgment was entered at the party's request, Judge Jordan appointed an independent fiduciary on behalf of the ESOP. So now the judgment says that any money recovered in this case will be paid to the ESOP. There's an independent fiduciary to make sure that takes place. The Department of Labor is here to make sure that takes place. All of the procedural protections that one could hope for . . . If the Department of Labor is not involved, you would agree there might be an agency problem? No, Your Honor, I would not agree with that. Well, I think that's a terrible idea. Well, Your Honor, if the Department of Labor had chosen not to get involved, plaintiffs would have at least had the option of moving for class certification, which is commonly done in these ERISA cases, and at that point there would have been court oversight. There would be appointed class representatives and appointed class counsel. That wasn't necessary here, however, because the Department of Labor got involved early in the case, which obviated the need for a formal certified class. Well, you would agree that were that . . . Okay. I'm just . . . As I said, I thought Judge Sheridan had maybe given a little . . . too little attention to the nuances there. Your Honor, do you have any further questions on that? Okay. I'd like to use the remainder of my time, if I may, to follow up on two issues that came up in the course of questioning with Mr. Johanson. First was this court-created valuation idea. As one of Your Honors noted in colloquy, that's what happens in almost every valuation case. The judge or the jury hears the evidence, weighs the pluses and minuses and the strengths and weaknesses, and makes its own determination about valuation, and that's what happened in this case. Judge Sheridan was very clear in his written opinion. He says he wasn't just splitting the difference. Like each expert in the case, the court is taking a number of evaluations under different methods and assumptions, and then combining the results to arrive at a figure. In this way, the court's sample pool is larger than those averaged or weighted by the individual experts. That's not creating a new number out of thin air. That is creating a damages number based on all the evidence in the case. Judge Sheridan did an exemplary way of doing that. And in terms of the $3.8 million argument that Mr. Johanson led with, he's apparently argued that that was the most critical mistake that the trial court made. But I think he's missing the big picture here. What happened with the $3.8 million was this is money that the ESOP paid. They wrote a check for $3.8 million to BAI, as they were required to do under the loan documents. Now, BAI didn't transfer that to the limited liability company, but that doesn't change the fact that the ESOP spent the money. That's real damages, no matter how you measure it. And not only that, as the court noted, that's money that was received by Mr. Brewster. It didn't go into thin air. That went into Mr. Brewster's pocket. It was not received by Mr. Brewster. It was not received by the BFLLC, Your Honor. The money remained with BAI, and that money was Mr. Brewster's money. Well, you say it was Mr. Brewster's, but by the time that deal was done, the ESOP owned about 80 percent of the stock, didn't they? Yes, Your Honor. So it was really from one pocket of theirs into another pocket, and they shared the tax benefits, right? Yes, Your Honor, but BAI was controlled by Mr. Brewster at that time, and he made the choice not to transfer the money to BFLLC. And, again, we don't know his motivation for that. But it doesn't matter. Once he made that decision, they both shared in the tax benefit, right? They shared in the tax benefit, but that does not change the fact that it's real damages suffered by the ESOP. When you're looking at damages in a situation like this, the question is how much did the ESOP pay and how much did they overpay in the transaction? And the fact that BAI didn't transfer the money to BFLLC, that is a transaction by almost a third party in the situation. I guess what you're saying is whatever advantages or disadvantages that they suffered together is not a question in this case. The question is has there been a breach, and as a result of that breach, was there a difference in the fair market value that was paid and the fair market value that may be what the bargain should have been? Exactly. Irrespective of the fact that they might have got some coextensive tax benefits. Yes, Your Honor. At the time of this transaction, the ESOP was overcharged, according to the judge's findings, by $4.5 million, and that is how much the amount of their damage. Now, whether after the fact, you know, Mr. Brewster, you know, moved money around between his different entities, you know, is— Whether it turns out to be a good deal or a bad deal later isn't the touchstone of whether there's breaches and what the damages are for those breaches. Yes, Your Honor. That— How do you—if I can impose on— Oh, please. I thought it was— How do you answer the windfall argument that's being made by the appellants? I have a few short answers to that, Your Honor, and I hope I'm answering your question. Please tell me if I'm not. The whole windfall argument is something of a red herring here because a windfall is when an injured party recovers his or her damages twice. It's not recovering your damages once. No, it's not. It's recovering more than you're supposed to. It may be 1.5 times, but not twice. Right, and— I'm misunderstanding what you're saying. No, Your Honor, but the question here is what is the measure of damages? And the measure of damages here is the difference in value between the actual fair market value of the company at the time, back in 2004 and 2005, and the amount that the ESOP paid for the company. And that difference in value is $4.5 million. Oh, you're talking about the total $4.5 million? Yes. I mean, you're not talking about the December 2004 transaction. The $3.8 million mirror loan is only on the December 2004, right? Am I wrong about that? I thought it was. I—I apologize, Your Honor. I don't remember the chronology. I know that the— There was one mirror loan. The middle—the September of 2005 was paid in cash, and the December of 2005 was financed on a different basis. In December 2005, the 2004 mirror loans were paid in full and refinanced, basically. That was the $3.8 million. In December 2005. Okay. And so— I'm talking about the transactions. There were three transactions at issue. One was December 4 of 2004, right? Yes. September of 2005 and December of 2005. Yes. All right. Now, maybe I was mistaken, but I thought the mirror—you're talking about this $4.5 million, and you were—and you're referring to a gross figure. My understanding was that the $3.8 million referred to just one aspect of the borrowing and one of those stock sales. The $3.8 million is a reference to the December 2004 transaction. Okay. And everything from that transaction was refinanced in December of 2005. So the December 2004 transaction and the December 2005 transaction are sort of one and the same because all the debt from 2004 got rolled over into 2005 and refinanced in new notes. So— Well, where was the $900,000 over—the judge calculated a separate overpayment for each transaction, did he not? Yes, ma'am. And it was $900,000 for December of 2004, right? And then zero—well, I forget what the overpayment—it was smaller for September, right? And then a larger one for December of 2005. Yes. And so the overpayment amount, as you say, was $900,000 for the first transaction, $236,000 for the second transaction, and then $3.3 million for the last transaction, which is really the culmination of the entire—of all three transactions together because in December 2005—the December 2005 and the September— December 2004 and September 2005 transactions were refinanced and reissued with a new note, a whole new set of transactions. And to quickly address the question of windfall, the— You need to wrap it up pretty quickly. Yes, Your Honor, I understand. The law is clear in terms of the payment of the promissory notes. The case law is unanimous that that is a proper element of damages whether or not the notes were ever repaid. And there's no law to the contrary that is offered by the defendants here. Moreover, it's important to consider that in order to avoid a windfall to the wrongdoer. In this situation, Mr. Brewster walked away from the transaction with $25 million in his pocket tax-free. That's from the entirety of the one or from the three transactions that you're talking about? That's from the entirety of the five transactions beginning in, I think— But those are outside—what did he walk away with from these three? Because those are the only ones you can sue on, and there's no evidence that the others were improper. I don't have the breakdown on that, Your Honor. I apologize. No, I apologize. The—I'm sure I could figure it out, but I just don't have that at my fingertips. I apologize. The—what is important, I think, to recognize, though, in terms of the windfall question is the fact that the company was overvalued by, as the judge found, $4.5 million. This inflated price made the company unsustainable because— Can you reconcile that with his accepting Mr.—well, I'll go into it with the next lawyer. Okay, you've got about 30 seconds to wind down. Okay. I believe I've heard all my points, Your Honor. Thank you very much. Thank you, sir. Mr. Delberman will represent the Department of Justice. Labor. Labor, I'm sorry. And he has points. May it please the Court, Stephen Silverman for the Secretary. As we demonstrate in detail in our opening brief, the district court correctly found, following a four-week bench trial, that Defendant Brewster engaged in egregious misconduct in violation of ERISA when he sold his company stock to his employee's pension plan, for which he was a trustee in a series of self-serving transactions. There's no doubt that the decision below was thorough and carefully reasoned and well supported by the enormous record in this case. I will be focusing on the district court's comparatively narrow error, giving great weight to the testimony of Brewster's valuation expert, even though it was inconsistent with the court's own factual findings. So you want a new trial on damages? No, Your Honor. Liability? No, Your Honor. The Secretary does not believe that a retrial is necessary. There's already been a trial, obviously, and there's a 34-page opinion from which we can gather that there is uncertainty in this case that the court acknowledged in the calculation of the valuation appraisal and the valuation of the company at the time of the transaction. This is a particularly apt scenario for an order by this court to rescind the transaction and to return the money paid to the ESOP and return the stock back to Mr. Brewster. Where you have these kinds of uncertainties, rescission is particularly appropriate, as well as when you have this type of egregious misconduct. There should be rescission? Yes, Your Honor. The Secretary requested below an order of rescission, and rescission is particularly appropriate, again, given the uncertainties present. Tell me why, as a practical matter, neither side wants this. I mean, the Labor Department wants this, but the company and the private litigant, they're not asking for this, right? Certainly the company is not. The private litigants have— Brewster. I'm sorry. Brewster. That's correct. I cannot speak for the private plaintiff's position as to whether rescissions should be ordered. They're certainly not seeking it on appeal. You are correct, Your Honor. They did not—below, they did not contest an order of rescission, and rescission, again, is appropriate and certainly authorized under this court. Let's say that rescission would have been an available thing for the judge to do. Why was it wrong for the—why is it clear error? The error of the—excuse me. The court's error in not ordering rescission was that it did not do so because it believed that that would create a windfall to the plan. But there's no windfall in a case like this because it's not a windfall to charge fiduciaries who use ESOP money to overpay for companies' stock in disloyal and illegal transactions. On the other hand, they're not entitled to get more than their actual damage. That's correct, Your Honor. And the order of rescission would put them back in the position they would have been but for the illegal conduct in this case. I have a question about that because if you take the position that there's a windfall if you don't have rescission, that presumes that you make the deal and that because you make the deal, someone may be better off by the fact that you made the deal. But if you look at rescission, you would have had no deal at all. So how is there a windfall to anybody if you had no deal at all? If everybody just gets back to where they were before this ever started, what is creating a windfall? Well, the argument by the district court is that it would be a windfall for the plan to receive a rescission or a remedy, not that it would be a windfall not to order rescission. But if I may address your point, the idea that we would be back before the transaction occurred presupposes that those contributions that were made to the ESOP in return for the labor that was done by the 1,304 employees necessarily would have been expended in these illegal transactions. That's not the way that rescission works. The way that rescission works is to undo the illegal transaction, which is the purchase of employee stock for greater than fair market value, and then to return the money that was paid. It's a little bit more complicated because if you don't have this transaction and the company goes down the tubes like what happened before, there wouldn't have been any value in the ESOP stock that existed prior—that was there, right? If you don't have—but you would still have the ESOP contributions, Your Honor, and the ESOP contribution—again, we would be presupposing that the contributions are being used to purchase employer stock for greater than fair market value. The Eves v. Penn case from the 10th Circuit is instructive in this regard. In that case, the employer stock declined in value and became virtually worthless, and the court ordered the transaction undone. The money was returned to the ESOP, and the shares were returned. The trust law is clear under this point, under Restatement Section 214. This court's precedents support that under the Huddleston case and the securities law context. So the idea that returning the stock—excuse me, the exchange of stock and undoing the illegal transaction is well settled in this case. So your argument then is that the judge was wrong about the windfall, and if he's wrong about the windfall, then as a matter of course he should have ordered rescission? Yes, Your Honor, although we do believe we have to first establish and recognize that the adoption and the use of Greg Lane's evaluation report for the calculation of damages was an error as well, and we believe that that decision to choose the route to go to calculation of damages through an overpayment formulation was an error in this case because it relied on an evaluation report issued by Greg Lane that was in conflict with the district court's own factual findings in two main ways, Your Honor. The first, that the court found that the expert disagreements over whether BAI was a growth company simply offset. But crediting Williams' notion that BAI was a growth company, it conflicted with the court's unequivocally negative findings about BAI's business prospects at the time of the transaction. For example, the court found that BAI relied upon a single client, DirecTV, who could and did unilaterally implement dramatic changes in BAI's business model that threatened its very existence. Second, the court was in error to credit and rely on Williams' report because he relied on Williams' fair market values even though they were higher than Donnelly's fair market values that the court found to be inflated, both because Donnelly was motivated to inflate the values to please Mr. Brewster as well as because he failed to receive complete information about BAI's business and I suppose received overly optimistic information in that regard. That internal inconsistency under the Bessemer case creates a clear error and then we're back to deciding what is the proper remedy. The proper remedy . . . But do you have any case where rescission has been ordered in an ESOP fiduciary duty? Yes, Your Honor. Hughes v. Penn from the Tenth Circuit . . . And was rescission ordered in that case? Yes, Your Honor. And it was an ESOP? Yes, and it was an ESOP and it was where the ESOP, the value of the stock, went down to virtually nothing. Why would anybody . . . An ESOP is a plan that was designed to benefit not only the employees of companies but also the entrepreneurs, right, from a tax standpoint. Now, if you accept that, which I think is plain, and you may not, but just play along with me, if that's the case, why would anybody ever do an ESOP if they could be sued and have the whole thing rescinded? Well, people do . . . So, first of all, the availability of rescission as a remedy is acknowledged and accepted, so . . . It's not required. I understand. And so, ESOP transactions, thousands, tens of thousands of ESOP transactions are done throughout the country every year with the full well knowledge that the rescission of . . . Excuse me, the remedy of rescission is an available remedy that's accepted across the circuit. So, that has not been an inhibition to ESOP transactions and to company owners seeking to sell their company to their employees through an ESOP. There's . . . And whenever you . . . Given the Bagheri's in valuation for closely held companies, it would be a very risky move for any entrepreneur to set up an ESOP, which is often the only way the employees can buy him out at some point, right? It would be a very risky move if . . . I'm not sure I understand. There's always . . . There's always risky moves any time, but there would be no incentive for the employer to do that if he could be sued for rescission. Well, again, Your Honor, the . . . If he just sold it, if he just sold it to them, there would not . . . You know, unless he committed outright fraud, which this is not. This is a breach of fiduciary duty. It ain't fraud. If he just sold it to them and then they sued because it wasn't worth what they thought it was, all you'd get is contract damages, right? If he financed it through a third party and then sold the stock out, right? Are you saying outside of the illicit plan contract? Correct. Correct. If this were just an ordinary breach of contract case, the amount of damages would be less difference of the value gotten and the value paid for and the value received, which is what the judge applied here, right? Yes, Your Honor. In a breach of contract case, that would apply, but this is an ERISA case. And any . . . Well, any individual who enters into an ERISA, an ESOP transaction, knows full well that ERISA provides for full equitable . . . a full set of equitable remedies, which include rescission. And the availability of rescission and the panoply of equitable remedies has not, again, inhibited thousands of ESOP transactions from happening every year, and probably a very high percentage of them, 90-some percent, the owners do not get sued. So there is, I suppose, if your concern is litigation risk, there's litigation risk whenever anyone enters into a complex multimillion-dollar transaction. But that litigation risk, which is present in ERISA, has not been inhibited. Let's say that you're right, that the judge made an error in how he computed damages. I don't know why that is an indication that rescission is compelled or should have . . . In other words, that error you can clear up by just having a hearing and getting the damage question answered. I don't know why an error as to damages means rescission should have been proper. And certainly, Your Honor, I should clarify. We're not taking the position that if there's an error, that the rescission is compelled. We are merely saying that it is the most appropriate remedy in this case, given the disparity in the experts and the facts of this case. Well, the disparities aren't that great, all things considered. But I don't quite understand why you say, if he threw out Range's testimony, did you move to exclude Range's testimony or to disregard it? Yes, Your Honor. Okay. Because I didn't see that in his opinion. But he decided to admit it after a Daubert hearing or whatever, right? That's correct, Your Honor. Okay. So before your argument has any punch, we would essentially have to disregard Range's testimony, which is why you were arguing clear error? Yes, Your Honor. But we're not arguing that Greg Range's testimony should be disregarded under Daubert for Daubert-related reasons. We're arguing under the Anderson v. Bessemer case that the crediting of Range created an internal inconsistency that is problematic, which is the kind of internal inconsistency that this Court has found in the estate of Jamison case as well. Since the other side got more time, I'd like to ask you to explain what your theory is about their argument that Messina and Mercer were both using Donnelly's discredited evaluation for their debt calculation in their fair market value. We have a couple of arguments, Your Honor. You didn't address that in your brief, I don't think. The argument that they were using Donnelly's discredited debt number, we did address that in our brief in the discussion of what defendants claim that there are two errors with the reliance on Messina, both the use of certain revenue numbers and the debt. And our explanation is that Mr. Messina, along with the other experts, was subject to multiple days of cost examination and provided what the Court determined to be an adequate explanation of his use of the debt number. Well, debt is not something—debt is an objective number. Debt is not evaluation, right? And neither of those fellows purported to say they were doing an expert evaluation of debt. Debt is what you owe. It's objective, right? Well, in this case, Your Honor, the testimony that because of the condition of the financials, it was an unusual circumstance where the experts could not agree on a debt testimony. That excerpt is provided in our brief where Mr. Messina explains it's very unusual. Usually debt is a number, but that is easily determined. But here, because the financials were in such bad condition, the debt numbers were in fact debated. And the experts had different approaches to how they handled that debt issue, and the Court determined that the handling of the debt issue was adequate by the parties. Well, actually, he didn't specifically comment on that, did he? He just said that he was going to credit them all, and then he was just talking about the valuations in sort of global terms, not with that degree of precision. He didn't specifically address that debt question, if that's correct, Your Honor. He did explain that the experts were subject to days of cost examination, and they provided adequate explanation for the handling of the underlying numbers. Let me ask you something. Their testimony had to do with valuation. Debt is just a portion or part of that evaluation. If he doesn't agree with their overall evaluations of either one, why does that preclude him from accepting one of their positions as to debt? In other words, why is it necessarily inconsistent for the judge to say, I don't agree that each of them have the right valuation, and why does that mean that he can't accept the debt portion of that for one of the experts? If I think I understand your question . . . Why is it necessarily inconsistent? We're not alleging that there is an inconsistency on the debt issue. We have two or three really specific inconsistencies that we identify. One is the inconsistency between crediting Williams' position that BAI was a growth company and the factual findings to the contrary. Two is crediting Williams' fair market values, even though they were higher than Donnelly's evaluations that the Court found to be inflated. And third, giving Greg Williams' testimony 50 percent weight when the Court found that all of the experts were equally credible and valuable. Your Honor, for the foregoing reasons, the Secretary requests that the opinion below be affirmed as to liability and that the Court reverse the District Court's damages calculation and issue an order rescinding the transaction or otherwise ordering the Court to calculate the loss without reliance on defendant's valuation. Okay. Thank you, Mr. Silverman. Mr. Johanson, you have some time for rebuttal. Five minutes. Thank you, Your Honor. I appreciate it. Quickly, and just focusing on rebuttal, starting with Mr. Copley, he mentioned that BAI was totally dependent upon DirecTV. Well, that was reported as a positive by Mr. Range in his report. He used the Coca-Cola bottling company example of how valuable the Coca-Cola bottling company was. Also, there's no evidence in the record that DirecTV ever terminated any of those contracts. They were contracts that went on perpetually. Mr. Brewster and his company, BAI, were one of the best performers in DirecTV's stable of companies, and that was proven at trial as well. Range looked at that issue as a positive. Your Honor, Mr. Copley also said that we focused only on the $3.8 million. That's not what we focused on in our brief or today. We focused on the incorrect debt amounts. We believe that there's evidence to the effect that the debt calculations were incorrect by Mr. Mercer and Mr. Messina. We believe that the Secretary never gave the correct debt information to Mr. Messina to rely upon, as reported at trial. Also, Your Honor, you talked about causation, and you talked about was there a breach. And, you know, again, we've stated our position on the breach and the position of what the trustees did and did not do. I'm not arguing that point right now, but assuming there was a breach, was the breach connected in any way to the damages? And that's the point we were making about unforeseen events, like the Siebel Systems thing that came in after the fact that cost the company a lot of dollars, the loss of the AT&T Bell South contract after the fact that happened after the transactions, things like that. So there's our, at least, our windfall argument. You want? Was Bruce Du still working with the company after the ESOP bought all the stock? Yes, he worked for the company until the end. On a contract basis or something? Yes, Your Honor. And he, by the way, he continued to loan money to the company the entire time throughout, as the record reflected, back and forth. The other point that Your Honor's talked to Mr. Copley about was the $25 million. I understood the exchange, but specifically, the actual amounts of the transactions were $18.4 million, $6.7 million. If you take the contracted purchase price, you add them up, $6.7 million, $1.2 million, and $10.5 million. That's $18.4 million for those three transactions in 2004 and 2005. But the actual amount of dollars, net dollars, that was presented at trial was roughly about $6 million that Mr. Brewster received for his company that he built for his entire life. Again, we take the position that the court valuations are not evidence, and Mr. Range's valuation was treated as well or better than any other valuation during the course. If it were an SEC case, you would order disgorgement, I suppose, right? I don't know. I don't know the answer to that. I'm sorry, Your Honor. But in terms of we do take the position that the court valuation is not evidence, as we've stated in our brief and as we've stated today. But if you don't agree with that, then the best thing for the judge to do if you don't agree with that position is to have the judge actually make a determination on valuations. And we believe that Mr. Range would carry the day in that. Mr. Range was slightly above the transaction prices every time, and Mr. Messina and Mr. Mercer were way down here every time. Your Honors, in terms of the growth company point, Mr. Range testified he used some demonstratives, and he showed economically the company going up with a chart like this. The projections, in terms of the projections, the projections that were used by Mercer and Messina were like that in his chart, in his demonstrative. And so Mr. Range did correctly conclude, based upon the economics of this company grew dramatically from dozens and hundreds of employees to 1,000 employees from 2002 through 2005, 2006 or 2007 even. This company was a growth company. Mr. Range testified as such. Did I misunderstand your point about the $3.8 million? I'm sorry, ma'am. Well, maybe it doesn't matter. Did I misunderstand your point about the $3.8 million? I don't know. Okay. My point on the $3.8 million was that it went into the ESOP. It went out to the corporation. It never went to Mr. Brewster or BFLLC. He never took it out. And secondly, my point is that Judge Jordan said in his opinion that there was never a release of stock from BAI to the ESOP. That's factually in error. And that's the point we made earlier, Your Honor. And I do— Mr. Johanson, thank you very much. Yeah, I do appreciate the time today. Thank you. You're quite welcome. Thank you. We're glad you came. Thank you all. Yes, indeed. We'll call the next case of the day, and that's Entergy Gulf States v. Sierra Club.